1                    UNITED STATES DISTRICT COURT

2                    SOUTHERN DISTRICT OF TEXAS

3                         HOUSTON DIVISION

4    UNITED STATES OF AMERICA,    )   CRIMINAL NO. 4:24-00253-2
                                  )
5    v.                           )   May 30, 2024
                                  )
6    MARQUIS RICARD,              )
                                  )
7    Defendant.                   )
     _____)

8
                     TRANSCRIPT OF DETENTION HEARING
9             BEFORE THE HONORABLE   RICHARD W BENNETT
                      MAGISTRATE COURT JUDGE
10
     APPEARANCES:
11
     For the Government:    LISA MARIE COLLINS, AUSA
12                          US Attorney's Office
                            1000 Louisiana St
13                          Ste 2300
                            Houston, TX 77002
14

15   For the Defendant:    GREGORY CHARLES GLADDEN
                           Attorney at Law
16                         3017 Houston Ave
                           Houston, TX 77009
17

18

19

20

21

22

23

24
     Produced by mechanical stenography; computer-aided
25   transcription

```
1                        I-N-D-E-X

2                          DIRECT      CROSS      REDIRECT

3   GOVERNMENT WITNESS:

4   JOSEPH THOMAS OPPEDISANO      4          16          23

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1  (In open court.)

2          THE COURT:  The Court next calls United States

3  versus Marquis -- is it Ricard or Richard?

4          DEFENDANT RICARD:  Ricard.

5          THE COURT:  Ricard.  Cause Number 4:24-CR-253.  The

6  parties please state your appearances.

7          MS. COLLINS:  Lisa Collins for the United States,

8  Your Honor.

9          THE COURT:  Good morning.

10          MR. GLADDEN:  Good morning, Judge.  I'm Greg

11  Gladden representing Mr. Ricard.

12          THE COURT:  Good morning.  We are set for I believe

13  detention.

14          MS. COLLINS:  That's correct, Your Honor.  And we

15  do you anticipate that we'll be proceeding.  Right?

16          THE COURT:  We'll be proceeding?

17          MS. COLLINS:  Yes.

18          MR. GLADDEN:  Yes, sir.

19          THE COURT:  Yes.  And we're also set for

20  arraignment.

21          MR. GLADDEN:  Yes, Your Honor.

22          THE COURT:  All right.  Let's proceed.

23          MS. COLLINS:  Yes, Your Honor.  The United States

24  calls Joseph Oppedisano.  And, Your Honor, do you have a

25  preference as to standing, seating while questioning?

JOSEPH THOMAS OPPEDISANO - DIRECT

1    THE COURT:  The table is fine.

2    THE DEPUTY CLERK:  Please raise your right hand.

3    (Oath administered by Shannon Jones.)

4    THE WITNESS:  Yes.

5    THE DEPUTY CLERK:  Thank you.  You may be seated.

6    JOSEPH THOMAS OPPEDISANO, GOVERNMENT WITNESS, SWORN

7                    DIRECT EXAMINATION

8    BY MS. COLLINS:

9    Q.    Please state your name for us?

10   A.    Joseph Thomas Oppedisano.

11   Q.    And could you spell the last name for us?

12   A.    It's O-P-P-E-D-I-S-A-N-O.

13   Q.    All right.  And what do you do for a living?

14   A.    I'm a special agent with the FBI.

15   Q.    How long have you been with the FBI?

16   A.    Since 2019.

17   Q.    Are you currently assigned to a specific division within

18   the FBI?

19   A.    Yes.  The violent crimes task force in Houston.

20   Q.    All right.  Can you tell us on a day-to-day basis what

21   you do within that division?

22   A.    Yes, investigate bank robberies, kidnappings, Hobbs Act,

23   which is the commercial robberies weapons charges, gangs,

24   drugs.  So, it's basically everything that's violent.

25   Q.    All right.  Through your work there, did you become

JOSEPH THOMAS OPPEDISANO - DIRECT

1   involved in a case involving a Marquis Ricard?

2   A.    Yes.

3   Q.    Can you tell us how you first became involved in that

4   case?

5   A.    So, the task force I'm on is comprised of agents and

6   Task Force officers which are from HPD, DPS, and other

7   federal, state -- other state agencies.  With that being

8   said, my partner who is an HPD Task Force officer came to me

9   one day, and there was a string of Uber, Lyft ride share

10  robberies that were happening within the Houston AOR it was

11  in a very short amount of time between April of 2023 and the

12  end of June of 2023.  So, he had come to me.  We were trying

13  to -- we were trying to figure out a way to mitigate and stop

14  the robberies from happening because they were still ongoing.

15  Q.    All right.  At that pointed was there some kind of

16  common scheme or MO that led you to believe that these were

17  all connected?

18  A.    Yes.

19  Q.    Can you tell us about that?

20  A.    Yes.  There were up to 19 incidences.  And during those

21  incidences the MO would be the subjects would request either

22  in their own name or have somebody request a ride share,

23  either Uber or Lyft in their name or in a different name and

24  then have the ride share company come pick them up at a

25  location of their choosing.  When they get in the car, it

JOSEPH THOMAS OPPEDISANO - DIRECT

1  would be between anywhere from two up to four unknown

2  subjects that would get in the vehicle.  And as soon as they

3  got into the vehicle, within minutes or a few minutes after

4  they departed, they -- pistols and weapons were drawn on the

5  driver.  And there's many instances where they were

6  assaulted.  But they were basically robbed for either debit

7  cards, cash, iPhones, or electronic transfers through Cash

8  App or some kind of electronic payment system, and then they

9  were let go later on in the course of the robbery.  They were

10  either pistol whipped.  Some were left not -- some were left

11  unharmed but just threatened.  Others were -- some -- there

12  was one that was sexually assaulted.  So that was kind of

13  their MO.

14  Q.  All right.  You said that each of the victims were then

15  let go.  Can you explain what was happening during the period

16  of time when these men would seek out these ATMs or other

17  forms of theft?

18  A.  So, they would look for debit cards to do then have the

19  driver most of the time drive them to the nearest ATMs to try

20  and withdraw the ATMs.  Sometimes the subjects, one of the

21  subjects would be move the victim into the passenger seat or

22  the backseat in order to drive them -- drive the vehicle

23  themselves to the ATMs, and they would go consistent ATMs

24  until they got money.  If they couldn't get enough money,

25  then they would drop the -- have them drop -- be dropped off

JOSEPH THOMAS OPPEDISANO - DIRECT

1    at an undisclosed location of their choosing and they would

2    get out on foot and run away either with money in hand, cell

3    phones that were taken from the victims, so.

4    Q.   All right.  Would it be fair to say that each of these

5    victims were held hostage during the period of time that

6    these thefts were being committed?

7    A.   Yes, they were not free to leave.

8    Q.   All right.  Of the 19 that you found so far, how many of

9    those of have been linked directly to Marquis Ricard?

10   A.   Approximately five.

11   Q.   All right.  Let's talk about each of those one at a

12   time.  Can you tell us about the first incident that we've

13   been able to link to him?

14   A.   Sure, yeah.  So the first one was May 13, 2023.  It was

15   a Lyft male driver.  And three unknown black males got into

16   the vehicle at an undisclosed location that was chosen by the

17   ride share account.  There was a pistol drawn to the back of

18   the neck of the victim, of the male victim.  At that point

19   they were robbing him for his belongings.  They wanted,

20   money, cash, whatever they can get that was of value.

21        He end he had up transferring approximately $2,000

22   through Cash App, to a cash -- from his Cash App or bank to a

23   Cash App account in the subject's, one of the subjects.  They

24   threatened to kill him.  And eventually after they got the

25   money and they were satisfied with whatever they received

JOSEPH THOMAS OPPEDISANO - DIRECT

1   they departed.  They basically told him to get out, and they

2   got out of the car where he stopped at their choosing and

3   departed the location.

4   Q.   And let me kind of pause you there.

5   A.   Sure.

6   Q.   You said that there was money directly refer to is a

7   Cash App account.  Can you explain that to us?

8   A.   Yes.  So, part of the MO was if they got into electronic

9   compartment of their phone they would either go to their

10   banking, their banks, their banking app or --

11        THE COURT:  You're talking about going into the

12   victim's phone?

13        THE WITNESS:  Yes, they would go into the victim's

14   phone.  They would go to the banking app or the Venmo cash

15   app, those types of electronic payment systems.  And try and

16   withdraw money by sending it to a cash app of their choosing.

17   BY MS. COLLINS:

18   Q.   All right.  In this case were you able to identify the

19   cash app account that the money was sent to?

20   A.   Yes.

21   Q.   And can you tell us about what account that was?

22   A.   Yes.  Of that was in the user name Bad Boy, user name:

23   Walk Down Drago.  Which is came back with the grand jury

24   results of Marquis Ricard's grand jury account.  There's a

25   transaction on that same date and approximately around had

JOSEPH THOMAS OPPEDISANO - DIRECT

1  the same time for approximately $2,057 -- 2,057 to that Cash

2  App.  So that's where we got that name from on the grand

3  jury.

4  Q.   All right.  And were you able to later confirm with the

5  defendant himself, Marquis Ricard that that was in fact his

6  Cash App account?

7  A.   Yes, when he was arrested we had an interview with him,

8  which he waived his rights for counsel and he spoke to us.

9  During that interview he told that you say his Cash App name

10  was walk Down Drago.

11  Q.   All right.  Was there any other connectivity between

12  that particular incident and Marquis Ricard?

13  A.   Yes.  So in that instance there was a cell phone that

14  was taken from that, from the victim.  When they departed

15  that cell phone was then picked at Marquis Ricard's residence

16  where he is ultimately arrested.  Law enforcement officers

17  went though that address and didn't want to expose the

18  investigation so they tried to -- they said that there was a

19  domestic call or domestic incident going on at the house.

20  They just identified the people that were coming into the

21  house.  But the phone was -- the victim was able to track and

22  ping his phone to that location, which drew the officers to

23  that location.  Ultimately, they did not -- they were not

24  able to identify it already inside the house.  There were

25  several other people in the background of the house that

JOSEPH THOMAS OPPEDISANO - DIRECT

1    were -- did not come up to the front door.  But ultimately

2    Marquis Ricard was arrested on July 5th at that location.

3    Q.    Would it be fair to say that when the officers went to

4    that address Marquis Ricard's mother did not allow law

5    enforcement access inside the home?

6    A.    Yes, to my knowledge, yes.  They did not -- she did not.

7    Q.    All right.  What was the next incident that was linked

8    to Marquis Ricard?

9    A.    The next one was on May 19, 2023 and that was a female

10   Lyft ride share driver.  Same kind of MO.  Got picked up at a

11   location.  She picked up four black males.  A pistol is

12   immediately drawn.  And then around $60 in Cash App was

13   transferred to a Cash App name again.  And then it was

14   relatively short because she did not have too much money on

15   her person and whatnot so it was transferred the money.  And

16   then they departed the location on foot again.

17   Q.    All right.  Were you able to link the Cash App in that

18   case?

19   A.    Yes.  It was the same Cash App name described in the

20   previous one for Bad Boy Walk Down Drago, which was

21   associated to Marquis Ricard.

22   Q.    So to be clear, the money that was being taken from the

23   victim's phones in each of these cases was going directly to

24   the account belonging to Marquis Ricard?

25   A.    Correct.

JOSEPH THOMAS OPPEDISANO - DIRECT

1   Q.   All right.  Were there any other links between that

2   incident and Marquis Ricard?

3   A.   No.

4   Q.   All right.  When is the next time that Marquis Ricard is

5   found to be involved in one of these incidents?

6   A.   So, this one is May 21, 2023 and it's a male Uber

7   driver.  He picked up four unknown black males and the

8   ride -- he explained that the ride display name was Marcus.

9   Immediately when he picked up the four unknown black males a

10  pistol was drawn at him and basically they told him don't

11  move or they'll shoot.  They took the phone out of his pocket

12  and attached, tried to get into access to see bank accounts.

13  The user names were not working properly.  So, that's when

14  the subjects used the gun to strike the victim in the head.

15  What we call pistol whipping where they pistol whip in the

16  head.

17  Q.   You said that there were issues getting into their

18  accounts.  Were they able to actually get any money from the

19  victim on that incident?

20  A.   Yes.  They got a Cash app transfer.  And then they also

21  went to several ATMs in order to try and obtain money.  This

22  was surveillance video at a Busy Bee.  It's a food gas

23  station store.  That vehicle pulls into, on camera, pulls in.

24  You can see that the vehicle is occupied five times and two

25  include the victim.  Two males get out of the backseat

JOSEPH THOMAS OPPEDISANO - DIRECT

1    leaving one person in the backseat and then two in the front

2    seat.  They go in and try to obtain money on it of the ATMs.

3    Marquis Ricard was not visualized on that video surveillance.

4    And then they departed the location and eventually released

5    the driver.

6    Q.   All right.  So how were we able to link that case to

7    Mr. Ricard, if he was not seen on the video.

8    A.   Ride share name was Marcus, which was linking us to him

9    being part of the four unknown black males that were listed

10   in that robbery.

11   Q.   All right.  When is the next incident that's linked to

12   him?

13   A.   The next one is May 24, 2023.  And that is an Uber

14   female ride share driver.  She picked up three unknown black

15   males.  As soon as, again, same MO.  As soon as they pulled

16   off, momentarily later pull out a pistol and put it to her

17   side for about -- so she can comply with the robbery that was

18   going on.  They went through the phones and -- they went

19   through her phone and threatened to do kill her if she didn't

20   give the passwords up.  And then they were just driving in

21   circles for a lot of time while they were trying to access

22   and gain access to the money so they can, you know, move it

23   over to whatever Cash App they wanted to designate it to.

24   Approximately -- while the Cash App was transferred to,

25   again, the -- I just want to the make sure I have this right.

JOSEPH THOMAS OPPEDISANO - DIRECT

1   It was transferred to the grand jury Cash App name again Walk

2   Down Drago, which is Bad Boy for the user name, which comes

3   back to Marquis Ricard.  He was -- Marquis Ricard was also

4   picked out on a photo array of this incident from the victim.

5   Q.   Okay.  Let me pass you right there?

6   A.   Sure.

7   Q.   Can you just explain to us how the photos spread lineups

8   were done in this case?

9   A.   Yes.  So they were double blind.  So I had no part and

10  my partnered no part because we -- part of the investigation,

11  where HPD created the lineups in their system.  It generates

12  a -- photo arrays.  There's six potential subjects on there.

13  And then people that are not connected to the case then go

14  out for us and deal with the victim and show them the photo

15  arrays and let them choose who they're going to choose.  And

16  they chose Marquis Ricard in this case.

17  Q.   All right.  And that was it is victim himself that did

18  that?

19  A.   Yes.

20  Q.   All right.  Were there any other links in that case to

21  Marquis Ricard?

22  A.   Yes, so there was CDR data pulled for their cell phones

23  and --

24          THE COURT:  What kind of data?

25          THE WITNESS:  CDR.

JOSEPH THOMAS OPPEDISANO - DIRECT

1              THE COURT:  CDR, oh.

2              THE WITNESS:  CDR data was pulled from their phones

3    based off of a warrant.  And cellular -- cellular presence

4    was near the pick-up and drop-off location of the incident.

5    BY MS. COLLINS:

6    Q.   And when you say the cellular presence, is that the

7    cellular presence of Marquis Ricard's phone?

8    A.   Yes.

9    Q.   All right.  And were you also able to confirm that phone

10   belonging to Marquis Ricard?

11   A.   Yes.

12             THE COURT:  Say that again.  Cellular presence of

13   the defendant's phone was where it was coming?

14             THE WITNESS:  At the beginning of the pick-up and

15   drop-off location.

16   BY MS. COLLINS:

17   Q.   All right.  Let's talk about the final incident that

18   he's linked to.  When did that occur?

19   A.   That was on June 11, 2023 with a female Uber driver.  A

20   ride share driver picked up three unknown black males.

21   Basically told the driver to pull over at a certain point

22   where she had felt a gun be pressed to the back of her head

23   or -- let me restate.  She had felt a hard object being

24   pressed to the back of her head, and she was told not to turn

25   around.  So, she believed there was a weapon.  Money was

JOSEPH THOMAS OPPEDISANO - DIRECT

1    transferred to  Cash App and two phones were taken at that

2    incident.  So, they accessed her phone again and same MO

3    where they electronically move money.  The Uber ride name was

4    Marquis Ricard this time.  That order had the actual ride for

5    them to be picked up in.

6               THE COURT:  Say that again?

7               THE WITNESS:  Marquis Ricard was the actual Uber

8    ride share name displayed when the victim had to accept the

9    ride share.

10   BY MS. COLLINS:

11   Q.   And you mentioned that Cash App was taken again or--

12   A.   Correct.

13   Q.   -- transferred to another account.  Were you able to

14   identify that account in this case?  In this incident?

15   A.   We're still waiting on grand jury material to come back.

16   But it was not the Walk Down Drago account Cash App.

17   Q.   All right.  So it was a different account?

18   A.   Correct.

19   Q.   All right.  Is there anything else that links Marquis

20   Ricard in this case to this incident?

21   A.   No.

22   Q.   All right.  At some point was Marquis Ricard arrested?

23   A.   Yes.

24   Q.   And to be fair to him, were there any issues with that

25   arrest?

JOSEPH THOMAS OPPEDISANO - CROSS

1   A.   No, he was arrested with no issues.

2   Q.   All right.  And was that at the same address where the

3   original incident where the phone pinged at his home?

4   A.   Yes.

5            MS. COLLINS:  Pass the witness, Your Honor.

6            THE COURT:  Cross.

7            MR. GLADDEN:  Yes, Your Honor.  Do you mind if I do

8   it from here?

9            THE COURT:  That's fine.

10                      CROSS-EXAMINATION

11  BY MR. GLADDEN:

12  Q.   The good morning?

13  A.   Good morning, sir.  How are you?

14  Q.   Good.  Thank you.  This case is pending in state court,

15  the Harris County District Court, and it has been pending for

16  ten months.  Correct?

17  A.   Yes, to my knowledge, yes.

18  Q.   And your Task Force, someone, I guess someone in your

19  task force decided to accept responsibility of prosecuting

20  this case at the federal court system even though the state

21  court system has these cases already.  Correct?

22  A.   Yes.

23  Q.   Okay.  Who made that decision, if you know?

24  A.   The decision to prosecute in the federal system?

25  Q.   For the feds to pick it up.

JOSEPH THOMAS OPPEDISANO - CROSS

1   A.   Well, when the task force officer comes over to our side

2   in the office and discuss the case, we look at it to see if

3   there's any federal nexus that would choose to be picked up

4   by -- on the federal side for prosecution.  If it's a case

5   that's -- meets the federal nexus.  So, I don't know if it

6   was a decision directly made by a specific person, but we sat

7   down and talked about the case that was unfolding and the

8   investigation that could be utilized in the federal system.

9   Q.   Okay.  And I'm sorry, what was your partner's name

10  that's with HPD?

11  A.   James Huckabee.

12  Q.   And those state court cases have not been resolved as

13  far as you know, correct?

14  A.   As far as I know -- umm.  I don't work for the state, so

15  I don't know.  But as far as I know, they're still pending.

16  Q.   Okay.  And as far as you know, my client, Mr. Ricard,

17  has been in custody on those other cases about ten months or

18  so.  Correct?

19  A.   Sure.  I do not know the duration, but yes, since

20  they've been -- since he's been picked up until he's been

21  writ-ed over in the state side.  Yes.

22  Q.   Okay.  And the interview where he apparently made some

23  incriminating statements, was that recorded?

24  A.   Yes, sir.

25  Q.   Was it video recorded and audio or --

JOSEPH THOMAS OPPEDISANO - CROSS

1  A.    Audio and video.

2  Q.    Okay.  And I know there's been some storms and some

3  damage to the U.S. attorney's office.  But those should be

4  available fairly quickly.  Correct?

5  A.    Yes.

6  Q.    For the defense.

7  A.    Yes.

8  Q.    Out of all of these robberies, not only the five you've

9  mentioned where there's some link to my client's Cash App

10  account, does he appear on any of the surveillance videos?

11  A.    No.

12  Q.    Does he appear -- has he been identified by any of the

13  victims as being one of the assailants or one of the robbers?

14  A.    Yes.

15  Q.    And who was that?

16  A.    That was in -- just bear with me one second.  I'll tell

17  you the date right now.  That was in -- on May 24, 2023, the

18  victim identified him in a photo array.

19  Q.    And, I'm sorry?

20  A.    May 24th, 2023, the victim identified him as -- in a

21  photo array.

22  Q.    Identified him as one --

23  A.    On one -- being the subject on the photo array.

24  Q.    Do you have any additional information about what that

25  victim said the other did not do?

JOSEPH THOMAS OPPEDISANO - CROSS

1   A.   I'd have to look back at the interview.  I don't want to

2   state whether -- I don't think the victim knew at the time

3   who the subjects were, their names, because obviously there

4   were three unknown black males in the vehicle holding --

5            THE COURT:  I think what he's asking is what did

6   the victim state that this person she identified did.

7            THE WITNESS:  That he was part of the robbery.

8   BY MR. GLADDEN:

9   Q.   And that was from a photo spread?

10  A.   Yes.

11  Q.   And his photo was included because of your --

12  A.   Well, just the investigation and leading to specific

13  names on the Cash App account, so -- share name -- names that

14  were populating.  That's how he became part of the

15  investigation.

16  Q.   And I'm jumping around a little bit here?

17  A.   Sure.

18  Q.   But when you went out the first time and met his mother,

19  you said she denied police entry to search the home?

20  A.   I was not part of that.  That was just regular local

21  police that responded to that.  I addressed from when they

22  responded to the victim's incident.  The victim had then told

23  them that the phone is pinging at this location.  So when

24  they got to the location, eventually the pinging had stopped

25  meaning that either the phone died or it turned off.  But

JOSEPH THOMAS OPPEDISANO - CROSS

1    there was no more pinging at that location.  But that's where

2    it led the police there.  But I was not part of that

3    location -- that incident.

4    Q.   Okay.  Well, as far as, you know, they did not have a

5    search warrant?

6    A.   They did not.

7    Q.   Okay.  So she didn't violate any laws by saying, no

8    thank you.  Y'all should stay outside.

9    A.   Correct, she did not.

10   Q.   Okay.  Do you have videos of the -- surveillance videos

11   or any videos relating to the May 24th robbery?

12   A.   I do not.

13   Q.   Do you know why?

14   A.   Just because the timing, but the time we get notified of

15   all the robberies that were happening and they would keep

16   ongoing, it was a scrambling to try and stop the incidents

17   from happening and continuing on through -- in through June.

18   So, by the time we got back to going through each case, I

19   think the time had lapsed for any additional ATM or

20   surveillance videos to be populated because there's typically

21   a 30-day turn around as they got erased.

22   Q.   You have interviewed other co-defendants or suspects in

23   this case.  Correct?

24   A.   Yes.

25   Q.   Have any of them identified my client as being in

JOSEPH THOMAS OPPEDISANO - CROSS

1    cahoots with them?

2    A.    No.

3    Q.    When he was arrested, were there any guns found in the

4    house?

5    A.    I was not part of that scene when he got arrested

6    because that was on July 5th.  And we arrested several other

7    subjects for this case and I was at a different scene.  From

8    my understanding, they conducted a surrounding callout where

9    they called the subject Marquis Ricard outside.  He came out

10   with no issues.  He did not have any weapons on him.  I do

11   not think they went in the house.  They did not have a

12   warrant for the house.

13   Q.    They didn't have a search warrant for the house?

14   A.    No.

15   Q.    Do you have any evidence of any kind of agreement that

16   he had to share the money that landed in a Cash App account

17   that was under his name?

18   A.    With other subjects are you talking about.

19   Q.    Yes, um-hmm.

20   A.    Not an agreement.  I don't know where the money went.

21   He had said he transferred money during his interview.

22   Q.    So you weren't able to follow the money be beyond it

23   landing in a cash an account under his name?

24   A.    Correct.

25   Q.    Okay.  Is there still money in that account?

JOSEPH THOMAS OPPEDISANO - CROSS

1    A.    We just updated the -- we just sent out the updated

2    grand jury subpoena in order to see what money is still in

3    there, if there's stuff that's still coming in.  But as of

4    right now I do not know if there's money in that account.  I

5    don't have access to it.

6    Q.    There's no seizure forfeiture action against that

7    account?

8    A.    No.

9    Q.    And you don't yet have the records of money

10   -- any money out of that account.  Correct?

11   A.    Up to present time, correct.

12   Q.    Okay.  So you don't currently have any evidence of it

13   going to another Cash App account or going from his Cash App

14   account to where it went.  Correct?

15   A.    No, I do not.  There was as lot of Cash App accounts

16   that were used throughout all these instances.  But we've

17   identified obviously his, for those specific incidences.

18   Q.    Okay.  So of these 19 robberies that you have kind of

19   linked in one way or another because of their mode of

20   operation I guess you have been using some of those

21   defendants own Cash App accounts the way his account was

22   being used?

23   A.    Yes.  But they've also used other people to use Cash

24   Apps as well.

25   Q.    Okay.

JOSEPH THOMAS OPPEDISANO - REDIRECT

1   A.   Like some of the people that would -- because whether I

2   had said that the MO sometimes where they would order had the

3   ride share in their own but they would also order -- have a

4   friend -- a female friend ready to ride shares which then

5   also would have Cash App money be sent to.

6   Q.   Okay.  You have evidence that some of those cash appears

7   were becoming used without the owner's consent?

8   A.   Not to my knowledge.

9   Q.   Okay.  Have other people who you've identified as owning

10  Cash App accounts where those -- the funds from those

11  robberies were sent, are they co-defendants in this case --

12  of these cases?

13  A.   No, no.

14  Q.   At the time he was arrested he was still in high school?

15  A.   I don't know that information off the top of my head.  I

16  don't know if he was in school or not as well.

17          MR. GLADDEN:  Pass the witness.

18          THE COURT:  Any redirect.

19          MS. COLLINS:  Just one question.

20                    REDIRECT EXAMINATION

21  BY MS. COLLINS:

22  Q.   I wanted to clarify one thing you said that, officer, to

23  be clear, each of the individuals whose Cash App accounts

24  were -- had money transferred out of them, did any of them

25  give consent to any of these individuals for that transfer?

JOSEPH THOMAS OPPEDISANO - REDIRECT

1    A.    No.

2    Q.    Okay.  So to be clear, they did not allow any of these

3    men, whoever they were, wherever position they were to take

4    any money from them?

5    A.    No.

6              MS. COLLINS:  That's all, Your Honor.

7              THE COURT:  Anything further, Mr. Gladden?

8              MR. GLADDEN:  No, Your Honor.

9              THE COURT:  Can the police be excused?

10             MS. COLLINS:  Yes, Your Honor.

11             THE COURT:  Do you have any other witnesses?

12             MS. COLLINS:  That's all, Your Honor.

13             THE COURT:  Mr. Gladden?

14             MR. GLADDEN:  No, Your Honor.  And in light of the

15   fact that he's got I think five state court cases, two of

16   them are set at no bond, I would just for the record say that

17   his mother, stepfather, and another friend of his are all

18   down here to support him and would not as a matter of proffer

19   believe he would be a flight risk because he doesn't have

20   anywhere to go.

21             I think they would say he was a high school student

22   with some learning disabilities.  When he was arrested, he's

23   been in jail ten months.  They don't believe he's a danger to

24   the community.  But I think it's a little bit academic if you

25   start setting conditions of release.  I'd like to withhold --

JOSEPH THOMAS OPPEDISANO - REDIRECT

1    or I would like the opportunity if something changes at the

2    state court level to come back and address those two issues

3    with the court.  But right now it's a little bit academic to

4    start arguing over detention.

5            THE COURT:  All right.  Okay.  So anything further?

6            MR. GLADDEN:  No.  No, Your Honor.

7            THE COURT:  All right.  Again, I obviously get it.

8    So we don't need any arguments.  But based -- Ms. Collins,

9    are you requesting detention based on the presumption?

10           MS. COLLINS:  Yes, Your Honor, under 3142(b)(3).

11           THE COURT:  Okay.  Based on, we had some testimony

12   presented, the Court finds that there's insufficient evidence

13   to rebut the presumption.  And the Court concludes by clear

14   and convincing evidence that there are no condition or

15   combination of conditions that would reasonably ensure the

16   safety of any person or the community.  And by a

17   preponderance of the evidence that there's no condition or

18   combination of conditions that would reasonably assure the

19   defendant's appearance at trial.

20           I find that the evidence -- and considering the

21   pretrial report and of course the evidence and the testimony

22   that was presented today, that there are no conditions, even

23   if there was evidence to rebut the presumption, I still find

24   that there's no conditions or combinations that would

25   reasonably assure the safety of the persons in the community

JOSEPH THOMAS OPPEDISANO - REDIRECT

1    given the type of crimes that were committed, the evidence,

2    the nature of the crimes, the fact that the defendant faces a

3    lengthy sentence upon conviction.  These crimes were

4    particularly violent with people getting pistol whipped.

5    That there are multiple, multiple instances of these crimes

6    being committed on these ride share, ride Ubers.

7             In addition, the Court finds by a preponderance of

8    the evidence that the risk -- that there's a risk of

9    nonappearance given the defendant has five felony cases

10   pending in Harris County in addition to -- the Court also

11   considers the defendant's past drug usage as part of his

12   history and characteristics.  Given the weight of the

13   evidence in this case, the Court considers the fact that he's

14   been identified in the links Cash App as part of this

15   decision in finding that the defendant should be detained

16   pending trial in this case.

17             I will also issue a written order that will be

18   docketed in this case.  Is there anything further with

19   respect to the detention at this time from the government?

20             MS. COLLINS:  No, Your Honor.

21             THE COURT:  From the defense?

22             MR. GLADDEN:  No, Your Honor.

23             THE COURT:  Okay.  So, Mr. Ricard, you will be

24   detained pending trial in this case.  Do you understand that?

25             DEFENDANT RICARD:  Yes, sir.

JOSEPH THOMAS OPPEDISANO - REDIRECT

1          THE COURT:  Are the parties ready to go ahead and
2     proceed to arraignment?
3          MS. COLLINS:  Yes, Your Honor.
4          MR. GLADDEN:  Yes, Your Honor.
5          THE COURT:  Okay.  Please come forward.  All right.
6     Mr. Ricard, did you receive a copy of the indictment?
7          DEFENDANT RICARD:  Yes, sir.
8          THE COURT:  And have you reviewed it with your
9     attorney?
10          DEFENDANT RICARD:  Yes, sir.
11          THE COURT:  And you heard the charges and the
12     penalties that you are facing in this indictment?  You've
13     heard what those are?
14          DEFENDANT RICARD:  Yes, sir.
15          THE COURT:  Mr. Gladden, have you explained to him
16     and gone over the charges and the penalties that he's facing?
17          MR. GLADDEN:  Yes, Your Honor.
18          THE COURT:  Are you ready to enter a plea to the
19     indictment in this case?
20          DEFENDANT RICARD:  Yes, sir.
21          THE COURT:  And does the -- does counsel waive
22     formal reading of the indictment?
23          MR. GLADDEN:  Yes, Your Honor.
24          THE COURT:  Mr. Ricard, how do you plead?
25          DEFENDANT RICARD:  Not guilty.

JOSEPH THOMAS OPPEDISANO - REDIRECT

1          THE COURT:  All right.  A plea of not guilty will

2     be entered on the record in this case.  Can we please read

3     the dates?

4          THE DEPUTY CLERK:  Yes.  The motions are due June

5     the 3rd.  Any responses are due June the 13th.

6          The pretrial conference is July the 18th at

7     2:30 before Judge Bennett, the district judge.

8          The pretrial conference is July the 18th at 2:30.

9     The jury selection and trial is July the 22nd at 9:00 a.m.

10    before District Judge Bennett.

11         THE COURT:  All right.  And that will be entered

12    into the docket as well.  Any query from either side?

13         MS. COLLINS:  No, Your Honor.

14         MR. GLADDEN:  Can we find out if the government is

15    planning to have this designated as a complex case.  It seems

16    like it might be.  But in light of the short fuse on my

17    motions being due in three days, I wonder if we could just

18    find out what their intentions are in that regard.

19         MS. COLLINS:  I quite frankly had not given it

20    consideration.  But I do think it would be practical to do

21    so.  So I'll try to get that filed within the next 48 hours

22    or so.

23         THE COURT:  Okay.  You can resolve that amongst

24    yourselves.

25         MS. COLLINS:  Okay.

JOSEPH THOMAS OPPEDISANO - REDIRECT

1          THE COURT:  Anything further?

2          MR. GLADDEN:  I don't think so, Judge.

3          THE COURT:  Thank you all.  You're excused.

4          MR. GLADDEN:  Good to see you.

5          THE COURT:  You too.

6          (Adjournment.)

JOSEPH THOMAS OPPEDISANO - REDIRECT

```
1                          ***
2          I certify that the foregoing is a correct
3  transcript from the Audio Recording of proceedings in the
4  above-entitled matter.
5          I further certify that the transcript fees and
6  format comply with those prescribed by the Court and the
7  Judicial Conference of the United States.
8          Date signed:   June 24, 2024.
9
                          /s/ Leticia Lucia Ornelas
10                        Ornelas Reporting Services
                          San Antonio, Texas 78253
11                        (512) 550-6886
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```